**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                              **NO. 3:03cr120-HTW-JCS**

**JOHN H. WHITFIELD**

**SENTENCING MEMORANDUM ON BEHALF OF JOHN H. WHITFIELD**

Defendant John H. Whitfield, through his counsel of record, files this Sentencing Memorandum setting forth all factors that he would request this Honorable Court to consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

**I.      SENTENCING REQUEST**

Mr. Whitfield requests that this Honorable Court, after considering the arguments to follow, make sufficient findings on the record and sentence him to time served, being a term of imprisonment of thirty-eight months.  In the alternative, Mr. Whitfield urges the Court to sentence him in a manner that releases him immediately from his current confinement at the Federal Medical Center in Lexington, Kentucky ("FMC Lexington") and permits him to serve any remainder of his sentence in some lesser means of confinement such as home confinement, which is sufficient to satisfy the goals of sentencing.

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 128 S.Ct. 586, 596 (2007); *United States v. Williams*, 517 F.3d 801, 810 (5th Cir. 2008).  While "the Guidelines should be the starting point and the initial benchmark," they "are not the only consideration."  *Gall*, 128 S.Ct. at 596; *see also Williams*, 517 F.3d at 810.  The district court must "consider all of the [18 U.S.C.] § 3553(a) factors" and "must make an individualized assessment based on the facts presented." *Gall*, 128 S.Ct. at 596-97; *see also Williams*,

517 F.3d at 810.  The ultimate task before the Court is to fashion a reasonable sentence based on the Guidelines, the Section 3553(a) factors, and the application of the Court's considerable discretion. *Kimbrough v. United States*, 128 S.Ct. 558, 576 (2007).

Mr. Whitfield reported to prison on December 27, 2007, under a sentence handed down by this Court of "Sixty (60) months as to Counts 1, and 4-7; One hundred ten (110) months as to Count 11, to run concurrently, for a total sentence of 110 months."  D. # 617.  The Court also imposed three years of supervised release.  *Id.*  On appeal, Count 11 was reversed, and Mr. Whitfield's sentence was vacated as to all counts.  D. # 766.

This Court's original sentence as to Counts 1 and 4-7 represents the upper boundary to which it should now sentence Mr. Whitfield based upon the existing convictions—that is, sixty months.  However, upon resentencing, Mr. Whitfield requests that this Court re-evaluate all § 3553(a) factors and conduct anew an individual assessment of his current circumstances.  Such an evaluation must lead the Court to the conclusion that a sentence of less than sixty months is warranted.

By the time he is re-sentenced, Mr. Whitfield will have been imprisoned for over thirty-eight months.  During that time, Mr. Whitfield has continued to demonstrate remorse, has sought to better himself, and has sought to better those around him.  At the same time, the terms of Mr. Whitfield's imprisonment have combined with the restrictions created by his ongoing medical needs to result in a sentence that is disproportionately more punitive in nature than is true for either his co-defendants or for other similarly situated inmates.

Further, with the benefit of the thirty-eight months which have passed since this Court initially sentenced Mr. Whitfield, it is now clear that the sentence proposed in this Memorandum is more than sufficient to satisfy all of the sentencing goals the law imposes.

The § 3553(a) goals of deterrence, protection of the public, and respect for the law have been satisfied by the sentence Mr. Whitfield has already served.  Further incarceration only serves a purely punitive purpose which is detrimental to his deteriorating health condition and his reacclimation into society.  The Sentencing Guidelines, the § 3553(a) factors, and other mitigating factors all lead to a conclusion that Mr. Whitfield should be sentenced to time served.  In the alternative, even if the Court finds that additional confinement is necessary, the Court should fashion a sentence of some form of lesser confinement than prison, such as home confinement.[1]

Taking this Court's previous sentence and advisory Sentencing Guideline Calculations range as the "initial benchmark," Mr. Whitfield asks that the Court take into account his long history of service to his church, his community and his country, his good character, and his family circumstances and issue a lesser sentence which comports with Mr. Whitfield's individual circumstances.

This recommended sentence is within the range provided by the advisory United States Sentencing Guidelines and comports with the policies stated in Section 3553 (a).  To the extent that the Court finds that any recommendations in this Sentencing Memorandum vary from the Guideline range, those variances are justified and appropriate, based on an individual assessment of Mr. Whitfield's circumstances, which vary greatly from those of his co-Defendants.

---

[1] Because of his medical condition and treatment needs, Mr. Whitfield is not eligible for camp placement as noted by his treating physician at FMC Lexington.  *See* Exhibit C, notes of Dr. Holbrook, Medical Officer at FMC Lexington ("You are care level 3 by BOP Definition Specifically including "Inflammatory Bowel Disease on medications" – this is BOP policy.  Care level 3 placement in camp environment does not happen to my recall & advice of my Administrative Chain of Command.  Thus, you can expect Medical Center designation for the remainder of your sentence."  For this same reason, Mr. Whitfield is not eligible for halfway house placement.  No person suffering from Crohn's Disease at FMC Lexington has been granted halfway house placement over the last three years.  However, Dr. Alfred McNair, who has also written letters to this Court on behalf of Mr. Whitfield (*see* Exhibit A, 00001 and 000049) has offered to provide the needed medical treatments to Mr. Whitfield, should the Court fashion a sentence that results in his release.

## II.    SENTENCING UNDER *BOOKER*

On January 12, 2005, the Supreme Court ruled that its Sixth Amendment holding in *Blakely v. Washington*, 124 S. Ct. 2531 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000) apply to the Federal Sentencing Guidelines. *U.S. v. Booker*, 125 S. Ct. 738, 756 (2005). Given the mandatory nature of the Sentencing Guidelines, the Court found "no relevant distinction between the sentence imposed pursuant to the Washington statutes in *Blakely* and the sentences imposed pursuant to the Federal Sentencing Guidelines" in the cases before the Court. *Id.* at 751. Accordingly, reaffirming its holding in *Apprendi*, the Court concluded that

> [a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.

*Id.* at 756.

Based on this conclusion, the Court further found those provisions of the federal Sentencing Reform Act of 1984 that make the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), or which rely upon the Guideline's mandatory nature, 18 U.S.C. § 3742(e), incompatible with its Sixth Amendment holding. *Booker*, 125 S. Ct. at 756. Accordingly, the Court severed and excised those provisions, "mak[ing] the Guidelines effectively advisory." *Id.* at 757.

Instead of being bound by the Sentencing Guidelines, the Sentencing Reform Act, as revised by *Booker*,

> requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A. § 3553(a)(4) (Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a).

*Booker*, 125 S. Ct. at 757. Thus, under *Booker*, sentencing courts must treat the guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a).

The primary directive in Section 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant; and
(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors:

1)     "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1));
2)     "the kinds of sentences available" (§ 3553(a)(3));
3)     "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (§ 3553(a)(6)); and
4)     "the need to provide restitution to any victims of the offense." (§ 3553(a)(7)).

Other statutory sections also give the district court direction in sentencing.  Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to "recogniz[e] that imprisonment is *not* an appropriate means of promoting correction and rehabilitation" (emphasis added).

Under 18 U.S.C. § 3661, "*no limitation* shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (emphasis added).  This statutory language certainly overrides the (now-advisory) policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth.  *See* U.S.S.G. § 5H1.  *See also United States v.*

*Nellum*, 2005 WL 300073. 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005) (Simon, J.) (Taking into account the fact that defendant, who was 57 at sentencing, would upon his release from prison have a very low likelihood of recidivism since recidivism reduces with age; citing Report of the U.S. Sentencing Commission, Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines, May 2004); *United States v. Naylor*, __F. Supp. 2d __, 2005 WL 525409, *2, 2005 U.S. Dist. LEXIS 3418 (W.D. Va. Mar, 7, 2005) (Jones, J.) (concluding that sentence below career offender guideline range was reasonable in part because of defendant's youth when he committed his predicate offense – he was 17 – and noting that in *Roper v. Simmons*, 125 S. Ct. 1183, 1194-96 (2005), the Supreme Court found significant difference in moral responsibility for crime between adults and juveniles).

The directives of *Booker* and § 3553(a) make clear that courts may no longer uncritically apply the guidelines.  Such an approach would be "inconsistent with the holdings of the merits majority in *Booker*, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in *Booker*, directing courts to consider all of the §3553(a) factors, many of which the guidelines either reject or ignore." *United States v. Ranum*, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. Jan. 19, 2005) (Adelman, J.)  As another district court judge has correctly observed, any approach which automatically gives "heavy" weight to the guideline range "comes perilously close to the mandatory regime found to be constitutionally infirm in *Booker*." *United States v. Jaber*.  2005 WL 605787 *4 (D. Mass. March 16, 2005) (Gertner, J.).  *See also United States v. Ameline*, 400 F. 3d 646, 655-56 (9th Cir. Feb 9, 2005) (advisory guideline range is "only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence"), *reh'g en banc granted*, 401 F.3d 1007 (9th Cir. 2005).

Justice Scalia explains the point well in his dissent from *Booker*'s remedial holding:

> Thus, logic compels the conclusion that the sentencing judge, after considering the recited factors (including the Guidelines), has full discretion,

> as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range.  If the majority thought otherwise – if it thought the Guidelines not only had to be 'considered' (as the amputated statute requires) but had generally to be followed – its opinion would surely say so.

*Booker*, 125 S. Ct. at 791 (Scalia, J., dissenting in part).  Likewise, if the remedial majority thought the guidelines had to be given "heavy weight," its opinion would have said so.  The remedial majority clearly understood that giving any special weight to the guideline range relative to the other Section 3553(a) factors would violate the Sixth Amendment.

In sum, in every case, a sentencing court must now consider **all** of the § 3553(a) factors, not just the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.  And where the guidelines conflict with other sentencing factors set forth in § 3553(a), these statutory sentencing factors should generally trump the guidelines.  *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J., concurring in part, dissenting in part) (arguing that since §3553(a) requires sentence to be no greater than necessary to meet four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes violates the statute and is reversible, even if within guideline range).

## III.   STANDARD OF PROOF

Although the Supreme Court in *Booker* determined, by making the Guidelines advisory, that a judge would make factual findings, it did not specifically address the standard of proof by which that judge would make the findings.  Given the magnitude of the advisory guideline range in this case, this Court should apply the reasonable doubt standard for three reasons.

First, neither Congress nor the Sentencing Commission has expressly provided for the preponderance standard to serve as the only proof standard at federal non-capital sentencing.  Congress, through the Sentencing Reform Act, has not spoken to the issue at all.  The Commission, in commentary to U.S.S.G. § 6A13, a policy statement, has stated only that it "believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy

concerns in resolving disputes regarding application of the guidelines to the facts of a case." However, this provision has not been officially re-examined since *Jones, Apprendi, Blakely,* and *Booker* were decided. *See Jones v. United States*, 526 U.S. 227 (1999); *Apprendi*, 530 U.S. 466 (2000); *Blakely*, 124 S. Ct. 2531 (2004); *Booker*, 125 S. Ct. 738 (2005).

Second, the reasonable doubt standard, which derives from the Fifth Amendment's Due Process Clause, applies as much to fact-finding by a court as to fact-finding by a jury. The Supreme Court case establishing this principle, *In re Winship*, 397 U.S. 358 (1970), addressed proof standards in a setting (juvenile proceedings) in which the Sixth Amendment's jury trial rights were not applicable. In other words, the *Winship* Court was concerned about assuring that judges apply the heightened proof standard, both to ensure the accuracy of fact-finding in individual cases, and also to ensure public confidence in the results of criminal proceedings: "[The] use of the reasonable doubt standard is indispensible to command the respect and confidence of the community in applications of the criminal law." *Id.* at 364; *cf.* 18 U.S.C. 3553(a)(2) (in determining appropriate sentence, court must consider the need to "promote respect for the law").

Third, district courts since *Booker* have found that applying the reasonable doubt standard to guideline enhancements, even under an advisory system, is not only appropriate but even necessary.

Finally, even before *Apprendi*, *Blakely*, and *Booker*, federal courts recognized that large increases in guideline range warranted the application of a higher standard of proof, at least clear and convincing.

Therefore, even if the Court disagrees with Mr. Whitfield that it must find facts beyond a reasonable doubt when determining the advisory guideline range, at a minimum, any facts that it relies upon to increase the offense level must be supported by evidence that surpasses the threshold of the clear and convincing standard.

IV.     **APPLICATION OF THE SENTENCING FACTORS TO MR. WHITFIELD TO DETERMINE THE APPROPRIATE SENTENCE**

Without making excuses for his conduct or minimizing the significance of his actions, Mr. Whitfield respectfully asks that the Court consider **all** of the available evidence regarding the context in which the accused criminal conduct arose as it determines the "just punishment for the offense," including the type and length of sentence which is sufficient, but not greater than necessary, to satisfy the purposes of sentencing. *See* 18 U.S.C. § 3553(a)(2).  Specifically, Mr. Whitfield asks that the Court recognize the following mitigating factors:

A.     **History and Characteristics of Mr. Whitfield**

1.     **Personal Information**

Mr. Whitfield is a 48 year old single father with six children:  Marcus, Greg, Derek, and Raeven Whitfield, Kesha Perry, and Chris Spillers.  Prior to his incarceration, Mr. Whitfield was his children's primary caretaker, supporting them both emotionally and financially.  Because he has been imprisoned over 13 hours away from his home, he has only seen two of his children since he was incarcerated, and he has only seen them on a single occasion.  Next year, two of his children will be in college.  His youngest son Derek has decided to attend college in North Carolina in an effort to secure a fresh start away from the publicity and stigma associated with this case.

Mr. Whitfield is a graduate of d'Iberville High School in d'Iberville, Mississippi, where he earned his diploma in 1980.  After graduating high school, Mr. Whitfield attended classes at Rust College in Holly Springs, Mississippi and enrolled in the United States Army.

From 1981 to 1983, Mr. Whitfield's service in the Army included acting as a squad leader and drill corporal.  For his service, Mr. Whitfield was awarded the Army Service Medal and the Army Commendation Medal.  He was also the top graduate of the Jungle Expert School in Panama and Air Assault School at Fort Campbell in Kentucky.

Mr. Whitfield attended Austin Peay State University, where he earned a Bachelor of Science degree in Public Administration, with a concentration in Political Science.   He then attended Valparaiso University School of Law, where he earned his *Juris Doctor* degree.   Mr. Whitfield continued his legal education in a variety of manners, including attending the National Judicial College at the University of Nevada at Reno, where he completed a number of courses while a judge.

Over seventy-five letters of support have been submitted to this Court on behalf of Mr. Whitfield, all of them requesting that the Court exercise mercy in its sentencing.   *See* Exhibit A.   It is to be expected that all such letters would speak well of Mr. Whitfield.   However, these letters highlight the breadth and the depth of the impact Mr. Whitfield has had on individuals around him throughout his life:

1) DeRonnious Heidelberg wrote to describe how he originally met Mr. Whitfield when he was paired with him during a Youth Career Day, and how Mr. Whitfield grew to be a father figure and mentor to Mr. Heidelberg over the seventeen years since, including influencing Mr. Heidelberg's decisions to serve in the Army:  "There are many times that I reflect on the day that I met Mr. Whitfield and wonder what my life would have been like without him and today as I am just coming home from my third tour in Iraq, I am forced to have a small glimpse into that thought and honestly it is a void that has no replacement" (Exhibit A 000002);

2) Sherwin Taylor wrote to describe how Mr. Whitfield took on a similar mentoring role with many youth at their church (where he served as Superintendent of Sunday School and as an Associate Minister), throughout the coast, at Moss Point High School, and with her two children:  "The only

father figure in the lives of many youth was Mr. Whitfield" (Exhibit A 000003);

3) Daphne Lowe wrote of her "dear spiritual friend," who she knew as the person who "has encouraged me at times that I would never admit to him or anyone else the kind of trials I was actually dealing with. He used to send all of us daily prayers that really helped with whatever I was dealing with at the time. I view John as a true servant and child of GOD. I have seen him help people who he knew nothing about and did not ask him for anything. I have seen him go out of his way to help people who did not know how to help themselves. John is a presence that is truly missed" (Exhibit A 000005);

4) Irish Reynolds wrote of Mr. Whitfield's role in strengthening the relationship between her and her mother, and also in guiding her through parenting her own children:  "to us he is a mentor, a parent, and a friend always willing to help better a person by listening and loving"  (Exhibit A 000019);

5) Attorney Judy Pace, a former clerk of Judge Whitfield's for three years, wrote of his work ethic and his legal talents.  She wrote of her observations of his volunteerism in the community, his mentoring of community youth, and his spiritual mentorship.  She also wrote that she has continually communicated with Mr. Whitfield over the last ten years and that "he has continually expressed deep, deep remorse for his decisions that have brought him before you. I believe that he has truly learned his lesson and that allowing him to go back into the community will benefit the community" (Exhibit A 000007);

6) Attorney Latrice Westbrooks, another former clerk of Mr. Whitfield, wrote of his influence on her becoming an attorney: "Since 1995 John has been the

Gibraltar who has praised my successes and caringly admonished my misjudgments. I unequivocally trust him and believe everyone should have someone in their life like him" (Exhibit A 000065); and

7) Mr. Whitfield's son Marcus wrote of the impact his father's absence has had on the family, especially Mr. Whitfield's children, and Marcus's efforts to keep the family together until their father returns home.  In a supreme sign of maturity, after pleading that his father be sentenced to time served for the benefit of his children, Marcus wrote "I understand that he may not be able to come home, and if he is not able could you please Judge Wingate have him moved a lot closer to home to a facility that can accommodate our needs and his medical needs" (Exhibit A 000008-12).

These are only a few examples.  Leaders of the religious community vouched for Mr. Whitfield's service to God prior to his imprisonment and his sincerity of remorse since.  His children and other family members described his positive influence on all of them and how much they miss his presence in their lives.  Others wrote consistently and movingly of their observations of Mr. Whitfield as a selfless man, a spiritual man, and a mentor and support for those in need.

Throughout, a portrait of a man appears, and that portrait paints a far greater and more complete picture than do the facts which led Mr. Whitfield to appear before this Court for sentencing.  Mr. Whitfield has throughout his life strove for academic and professional success. Moreso, he has given of himself and served those around him in a way that few ever do, and his positive influence has been felt throughout his community.

### 2.	Professional Information

Mr. Whitfield served as a Circuit Court Judge for the Second Circuit District Court for Hancock, Harrison, and Stone Counties from 1994 through 2000.  In addition to his elections as

circuit court judge, Mr. Whitfield was also selected to serve as a Special Attorney to assist the Biloxi Civil Service Commission and a Personal Grievance Hearing Officer for the City of Biloxi.

He also served on a number of committees and bar organizations, including the Judiciary Committee of the Mississippi Young Lawyers Division, the Federalist Society, the Victims' Rights Committee of the American Judges Association, the Judicial Concerns & Standards Committee of the American Judges Association, and the American Inns of Court Gulfport.

Mr. Whitfield also served as a member of the faculty at the University of Southern Mississippi, where he taught an upper level criminal law course.

Mr. Whitfield also authored at least eighteen different legal articles and other publications, frequently spoke to legal groups and community groups on a variety of legal and civic topics, and appeared on numerous television and radio programs to speak about crime, punishment, and civic responsibility.

### 3.   Medical Information

Mr. Whitfield suffers from Crohns disease, a chronic and debilitating gastrointestinal disorder of which there is no known cure. *See* Exhibit A at 000049-50 (letter from Mr. Whitfield's personal physician Alfred E. McNair), Exhibit B at 000006, and Exhibit C. As described herein, his medical condition is classified as Care Level III (Chronic care – unstable), with non-routine services/assistance devices needed. *See* Exhibit B at 000006.

The disease requires treatment through daily medications. More burdensome, Mr. Whitfield requires a chemical therapy treatment approximately every seven to ten weeks at a cost of approximately $7,000.00 per infusion. Even though he is otherwise qualified to move to a facility closer to his home, family, and support system, he must remain in Kentucky because of his medical condition.

4.       **Actions Since Conviction**

It is an unfortunate truth that a sentencing Court often has nothing more than its best judgment in determining whether a convicted defendant means what he says about accepting responsibility for his actions or expressing remorse.  A Court often has nothing more than its best judgment in determining whether a defendant understands the seriousness of the offense with which he was charged, or is adequately deterred from future criminal conduct.  Here, that is not the case. In fact, Mr. Whitfield has amply demonstrated over the last thirty-eight months that his life before the events which led to his imprisonment are the standard by which he should be judged, not one isolated portion of his life.

Mr. Whitfield has spent hours participating in and completing various institutional programming.  *See* Exhibit D, a collection of twenty-one certificates earned by Mr. Whitfield for his participation in religious and fitness training and services.  Mr. Whitfield has also sought to better inmates around him by teaching Bible study and tutoring fellow inmates to pass their General Education Development ("GED").   His actions have generated unsolicited positive reviews from the FMC Lexington chaplain.  *See* Exhibit B at 000008 ("Whitfield has been very involved in the FMC Chapel since his arrival at this facility. He has served in the choir, he assists in numerous bible studies, weekly hymn worship, assisted in the memorial services for deceased Inmates, and has preached at the midweeks service. He has helped chaplain staff organize November revival for the past two years. He relates well with both staff and inmates.")

By the time of sentencing, Mr. Whitfield will have served thirty-eight months in prison without incident.  *See* Exhibit B, "Inmate Skills Development Plan Current Progress Report:  03-03-2010."  In addition to the participation described *supra*, Mr. Whitfield's report documents his participation in bible study classes, Catholic studies classes, cultural classes, and nutrition classes. *See, id.* at 000002. Mr. Whitfield has maintained consistent work duties with evaluations of

"Outstanding" for all of his work.  *Id.* at 000002, 000004.  At the time of his transfer for this resentencing, Mr. Whitfield worked as a customer service clerk at UNICOR, where he has continued to receive outstanding job performance evaluations. *Id.*

### B.  Nature and Circumstances of the Offense

Mr. Whitfield has admitted to the basic facts of which he was accused.  He cooperated with law enforcement in its investigation.  He has always admitted to having accepted loan money from Paul Minor.  Mr. Whitfield offered a public statement of apology to the public and to the media. He also read this statement to the judge in open court.  In other words, Mr. Whitfield has at all times accepted responsibility for his actions, only contesting whether the actions constituted the acceptance of a bribe or part of a conspiracy to be bribed where an explicit *quid pro quo* was present. Mr. Whitfield has defended his judicial decisions as being independently and correctly exercised. Importantly, no evidence has ever been presented to the contrary, and the Government even successfully argued against submitting such an instruction to the jury in the second trial.

### C.  The Kinds of Sentences Available

In *Booker*, the Supreme Court severed and excised 18 U.S.C. § 3553(b), the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular sentencing guidelines range. *Booker*, 125 S. Ct. at 756.  This renders the sentencing guidelines advisory. *Id.*

While § 3553(a) requires the Court to consider all of the purposes of sentencing, it also requires the Court to consider all types of sentences available.  18 U.S.C. § 3553(a)(3).

Imprisonment, probation, and fines are all sentencing options available to the Court, and each can contribute to a specific sentencing purpose.  *See* 18 U.S.C. § 3551(b).  Prison, for example, can serve the purposes of retribution, incapacitation, and deterrence (both general and specific); fines can serve retributive and deterrent purposes; and probation also serves a punitive purpose

15

because it places significant restrictions on an offender. The guidelines suggest specific variations of these general types of sentences in the zones delineated in the sentencing table. *See* USSG §§ 5BC1.1 & 5C1.1. Specific conditions of probation can also serve specific sentencing goals. For example, home confinement and community service can serve the goals of retribution and deterrence, and these options drastically cut the costs to society of imprisonment. With these options available, the requested sentence would in no way neglect to achieve the statutory sentencing aims.

Thus, while a sentence of imprisonment would certainly be one way of addressing the need to reflect the seriousness of Mr. Whitfield's offense and provide a punishment in this case, a further imprisonment sentence beyond time already served by Mr. Whitfield is not a "just" sentence because it is greater than necessary when considering the need to accomplish all of the sentencing aims together. *See* 18 U.S.C. § 3553(a).

A probationary sentence can accomplish all of the sentencing objectives in this case. There is no need to send a message that recidivists will be punished more harshly, as Mr. Whitfield has no previous criminal history. A sentence of time served would be an appropriate and fair punishment for his wrongdoing. Should the Court feel any additional sentence is appropriate, it should look to types of sentences other than imprisonment, especially home confinement and community service.

### D.    The Need to Avoid Unwarranted Sentence Disparities with his co-Defendants or Other Similarly Situated Defendants

Mr. Whitfield's original sentence was greater than necessary, given that he has been punished more than other inmates because of his health condition and the other factors cited herein. As a general proposition, there are four penalogical goals underlying the federal sentencing criteria: (1) retribution, (2) general deterrence, (3) incapacitation, (4) and rehabilitation. *U.S. v. Mogel*, 956 F.2d 1555 (11th Cir. 1992); 18 U.S.C. § 3553(a)(2).

### 1.    Mr. Whitfield Has Been Punished More Than the Average Inmate

The Court should consider an alternative to incarceration when, because of illness, the defendant would be punished moreso than the average inmate. *U.S. v. Gee*, 226 F.3d 885, 902 (7th Cir. 2000). Mr. Whitfield suffers from Crohns disease, a chronic and debilitating gastrointestinal disorder of which there is no known cure. *See* Exhibit A at 000049-50, Exhibit B at 000006, and Exhibit C. He requires treatment through daily medications and a chemical therapy treatment approximately every seven to ten weeks at a cost of approximately $7,000.00 per infusion.

While a medical problem is not ordinarily considered an extraordinary concern justifying a downward departure, a disorder may qualify as "extraordinary" if it is substantially more dangerous for prisoners than non prisoners. If imprisonment would more likely than not shorten the defendant's life span and thereby make incarceration a harsher punishment than the same term for a healthy defendant, the district court may properly reduce the sentence's length when necessary to equalize the severity. *Gee*, 226 F.3d at 902.

Since 1999, Mr. Whitfield has undergone an annual preventive colonoscopy because of his chronic condition. His last colonoscopy was in December of 2007, just prior to reporting to prison. Because of Bureau of Prisons protocol, he has not had a colonoscopy since being incarcerated. This places Mr. Whitfield in jeopardy of developing severe complications due to his chronic illness and not discovering the complications in time to receive appropriate treatment.

### 2.     Mr. Whitfield Has Been Punished More Than His Co-defendants

On their faces, the sentences of Mr. Whitfield, Mr. Minor, and Mr. Teel appear to mete out equal punishment. However, in practical terms, Mr. Whitfield's punishment is harsher and even more punitive than those of not only Mr. Minor and Mr. Teel, but also other persons so sentenced who do not suffer from the same chronic illness as does Mr. Whitfield.

Upon initially being classified for placement within the Bureau of Prisons ("BOP"), all three of these Defendants were recommended for camp placement; that is, community out-custody. *See*

Exhibit B at 000001.  Mr. Whitfield's initial destination was Estill, South Carolina.  However, within ten days before he was scheduled to report on December 27, 2007, Mr. Whitfield was notified by mail that his designated BOP facility to which he was to report had been changed to FMC Lexington.  FMC Lexington facility is not a camp.  It is run as a medium/low security prison due to the various security classifications of the inmates housed there.  Accordingly, Mr. Whitfield's liberty is more restricted, and the opportunities available to him are drastically reduced when compared to those of his co-Defendants.

FMC Lexington is more than 500 miles from Mr. Whitfield's home district, despite BOP regulations stating that all inmates should be placed at facilities within 500 miles from their home districts to facilitate and foster family contacts and positive family relations.  Mr. Whitfield's co-Defendants are confined within these regulations, but Mr. Whitfield is not.

As a direct consequence of the vast distance Mr. Whitfield has been placed away from his family—a driving time of some thirteen hours—his ability to visit with his children has been greatly hindered.  As referenced in this Memorandum, he has been able to visit with only two of six children on only a single occasion over the past 38 months.

As noted by Mr. Whitfield's treating physician at FMC Lexington, who has tried on two previous occasions to have Mr. Whitfield transferred to a camp, Mr. Whitfield cannot be so transferred for any portion of his incarceration because of his Care Level 3 medical care level.  *See* Exhibit B at 000006.

### E. Mr. Whitfield's Sentence of Time Served Promotes the Statutory Objectives under 18 U.S.C. § 3553(a)(2)

A sentence of time served is sufficient, but not greater than necessary, to meet the goals of punishment, because it is the best way to provide Mr. Whitfield with essential medical treatment, while still deterring future criminal conduct and satisfying the needs of the public.  Section 3553(a)(2) defines the objectives of punishment as

(A)   to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense

(B)   to afford adequate deterrence to criminal conduct

(C)   to protect the public from further crimes of the defendant

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Taking each in turn, additional imprisonment is not necessary to reflect the seriousness of the offense, to promote respect for the law, or to provide just punishment in the instant case. Mr. Whitfield has already served thirty-eight months in prison. A prison sentence of over three years is more than sufficient to satisfy these criteria. This is more pronounced by the disproportionately punitive effect of the imprisonment of Mr. Whitfield. To the extent that the Court seeks to protect the legal and judicial system, that objective has been furthered by the recent permanent disbarral of all of these Defendants.

It is not necessary to further imprison Mr. Whitfield to deter future illegal conduct. This criminal matter is the only crime in Mr. Whitfield's life. Combined with his age and his history of community and church involvement, his lack of past criminal conduct provides substantial evidence that Mr. Whitfield is an unlikely recidivist. This evidence is further buttressed by Mr. Whitfield's own (now repeated) expressions of remorse for his actions and comprehension of the extent to which he has jeopardized the futures of his children. Quite simply, there is no factor in this matter that indicates any chance of further criminal conduct by this Defendant.

Furthermore, the certainty of punishment is as much of a deterrent as the length of punishment. Even the certainty of a conviction for a federal felony can have a significant deterrent effect on others, especially when such a conviction results in the significant loss of valuable civil rights and societal benefits such as job opportunities. Given that Mr. Whitfield can never practice

law again and must pursue another profession altogether, added to the fact that he has already served 38 months in federal prison, Mr. Whitfield acts as a deterrent example to others in the community that not following the law will lead to the loss of one's freedom to function in society.

If any additional concern remains by this Court on the issue of deterrence to the public, a more appropriate sentence than additional imprisonment is community service. Given Mr. Whitfield's history of mentoring in community schools and churches, and his history of public writing and speaking on legal issues, a far more appropriate sentence than imprisonment is to require Mr. Whitfield to resume serving his community by speaking and writing to others about what he has done, how he has been punished, and what can be learned from his example. It is clear that Mr. Whitfield possesses the ability to reach people, especially young people. His talents could be far better used by requiring appropriate community service than by burying them in federal prison.

A sentence of time served, or of time served combined with home confinement and/or community service, will advance the public's interest and satisfy all of the statutory sentencing objectives. Mr. Whitfield has already received punishment by serving over three years in prison, receiving public embarrassment, being permanently barred from the practice of law, and paying a fine of $125,000.00. Accordingly, § 3553(a)(7) "weigh[s] in favor of a sentence that would allow [Mr. Whitfield] to remain in the community and working." *United States v. Peterson*, 2005 U.S. Dist. LEXIS 6098, at *6 (E.D. Wis. Mar. 28, 2005).

An appropriate sentence for Mr. Whitfield will reacclimate him as a participating and valuable member of his family and of society. An appropriate sentence for Mr. Whitfield will return him to a location where he can again be a blessing to his children and his family. An appropriate sentence will make it possible for him to develop vocational and education training to work outside of the legal profession. To that end, community and church leaders including Dr. McNair and Pastor Kenneth Davis have offered him work in churches, including prison ministry and youth

ministry.  An appropriate sentence will permit him to receive preventative and treatment care for his Crohn's disease.  None of these criteria can be met by further imprisonment.  All can be met by the sentence proposed in this Memorandum.

## V.   THE SENTENCING RANGE ESTABLISHED BY THE SENTENCING COMMISSION

Under the provisions of the Guidelines, the correct guideline range should be a sentence at an offense level 18.  Additionally, the Court has the inherent power to deviate from the purported guidelines and to make a downward departure when considering factors which standing alone may not justify a downward departure, but when considered in conjunction with other related and unrelated factors support a Court's determination that a downward departure is warranted.  Thus, Mr. Whitfield asks that the court consider the following, pursuant to U.S.S.G. § 5H1 and its applicable subsections.

### A.      Base Level Offense

The Base Level Offense for violation of 18 U.S.C. § 371 is 10.  Sentencing Guidelines Manual § 2C1.1 (2001).[2]

### B.      Special Offense Characteristics

The Presentence Investigative Report applied too high an enhancement in determining the value of the "intended loss" or "intended benefit."   Section 2C1.1(b)(2) of the Sentencing Guidelines provides that, "[i]f the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official..., or the loss to the government from the offense, whichever is greatest, exceeded $5,000," the defendant's

---

[2] As a later edition of the Guidelines Manual would violate the *ex post facto* clause of the United States Constitution, the 2001 edition must be used in this case.  In accordance with the provisions of U.S.S.G. §§ 3D1.1 and 3D1.2(d), the counts of conviction are computed in a single group to determine the single offense level.

offense level shall be increased by the number of levels dictated in the loss table in Section 2B1.1.

U.S. Sentencing Guidelines Manual § 2C1.1(b)(2).

Here, the Report assumed that the value of the "benefit to be received" by Mr. Whitfield "in return for payment" was $1.6 million and recommended the corresponding 16 level enhancement in Section 2B1.1.  This finding was unsupported by any standard of proof, especially one of beyond reasonable doubt.  The Court should reject this recommendation and apply a lesser enhancement.

### 1.    The value of the benefit should be the amount of the loan

The Guidelines provide that "[i]n a case in which...the value of the benefit cannot be determined, the value of the bribe is used..." U.S. Sentencing Guidelines Manual §2C1.1 cmt. Background (2007); *see also United States v. Floyd*, 84 F.3d 433, *2 (5th Cir. 1996) (unpublished opinion) ("[I]n the absence of any reliable evidence concerning the amount of the benefit conferred on Gaubert, the value of the bribe would have been proper to be considered.").

The value of the bribe must be used in this case, because there is no way to determine the "value of the benefit."  At trial, the Government was not put to its standard of proof on this issue. At sentencing, no additional evidence has been presented from which a determination can be made even based on a preponderance of the evidence.  Especially in light of the magnitude of the enhancement, the Court should not attempt to determine that which is indeterminate.  Instead, the Guidelines provide a simple solution grounded in fact.  The Court should use the value of the bribe.

Here, the value of the bribe was found to be $100,000.00, which would lead to a sentencing enhancement of 10.

### 2.    Even applying the rationale in the Presentence Investigative Report, the enhancement should be reduced to account for the intrinsic value of the *Marks* case, and the realities of attorneys' fees.

Even if the Court were to adopt the opinion of the Probation Officer that the Mississippi Supreme Court's reduction of the *Marks* verdict to $1,600,000.00 represents the "intended loss," the

Court must take into consideration that (1) it is undisputed that the *Marks* case had intrinsic value without regard to any purportedly illegal activity, (2) no evidence has ever been introduced to prove that any portion of the *Marks* decision was wrongly decided, (3) out of any award to the plaintiff, only the fee to the attorney should be considered to benefit the attorney, and (4) out of any fee paid to the attorneys who represented *Marks*, only a portion of that fee would benefit Paul Minor, who was not the attorney who represented Marks.  Even applying a simple 40% contingency fee to $1,600,000.00 reduces the purported amount of the benefit to $640,000.00, which would result in a sentencing enhancement of 14.  Further reducing that amount to account for any benefit actually obtained by Mr. Minor would comfortably reduce the amount of the benefit to less than $400,000.00, further reducing the enhancement to 12.

### C.    Obstruction of Justice

The Presentence Investigative Report was wrong to apply a two level enhancement for obstruction of justice.  The Report found the enhancement appropriate because "Minor used a third party to pay off the loan, then provided a fraudulent promissory note to Mr. Whitfield to make it appear as though Mr. Whitfield's loan was paid off by Radlauer, rather than Minor. Mr. Whitfield re-typed and back-dated the note, then sent it to Radlauer, knowing that the note was fraudulent." Report, ¶ 56.

Here, the conduct described in the Report does not qualify as obstruction.  First, the conduct is included in the indictment as evidence of the underlying offense.  It is antithetical to the purpose of the Guidelines to use the same conduct to both convict a defendant and to enhance his

23

sentence.  It is axiomatic that the conduct which supported the indictment and conviction is already accounted for in the base level offense calculation.[3]

Second, the Guidelines provide specific examples of conduct which does not rise to the level of obstruction, including "making false statements, not under oath, to law enforcement officers." USSG § 3C1.1, n.5(b).  Even if the conduct described in the Report should be considered to enhance the advisory sentencing guideline, it is akin to making a false statement, not under oath, and not even to law enforcement officers.  In cooperating with law enforcement, Mr. Whitfield at all times provided factually accurate information about the described conduct.  Accordingly, the two level enhancement should not have been applied.

**D.      Acceptance of Responsibility**

The Presentence Investigative Report was wrong to deny Mr. Whitfield a two level downward departure for acceptance of responsibility.  Mr. Whitfield made public statements **prior to his original sentencing** to the public, the media, and to this Court that he understood his culpability and the criminal nature of his conduct in accepting loans guaranteed by Mr. Minor, though at the time he understood it to be legal activity.  Mr. Whitfield reiterated this in his statement to the media, in which he accepted responsibility for his conduct, and expressed his deep remorse for his actions.  Thus, Mr. Whitfield's offense level should be reduced by two levels.

Note 2 to Sentencing Guideline § 3E1.1 expressly notes that "[c]onviction by trial … does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a

---

[3] Additionally, such an application runs afoul of Mr. Whitfield's Double Jeopardy protections, in that it punishes him twice for the same conduct—first in providing a basis for indictment and conviction, and second in creating a 2-level sentencing enhancement.

constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." Mr. Whitfield presents exactly the circumstances described in the Guideline.

At no time did Mr. Whitfield deny the underlying facts of the case. His defense was simple—the accused acts did not constitute *quid pro quo* bribery. Further, his defense and subsequent appeals raised constitutional challenges to the honest services statute under which he was indicted and to the applicability of the federal program bribery statute under which he was indicted. Notably, his appeal was successful as to the latter point.

Furthermore, the government never put any real plea options on the table, even after the close of the evidence and after the Court recessed and told the government to come back with plea options for all defendants. After a lengthy recess, the government came back into the courtroom and gave each defendant a piece of paper, Mr. Whitfield's paper reading "the government makes no offer of plea to John Whitfield".

Mr. Whitfield offered an apology to this Court, to the public, and to his family. He cooperated with the government's investigation. However, he maintained that no *quid pro quo* bribery event ever took place, and he raised certain constitutional questions about his prosecution. Consequently, as those issues could not be resolved by agreement with the government, he had no choice but to have the issues resolved by trial and appeal.

Under the circumstances, Mr. Whitfield should receive a two level downward departure for his acceptance of responsibility.

### E.    Calculation of Guideline Sentence

Based on the foregoing information, Mr. Whitfield's Total Offense Level is between 18 and 22, depending on the Court's findings concerning the enhancement for amount of loss or intended

benefit.[4]  Mr. Whitfield has no criminal history, so his criminal history category is I.  Accordingly, Mr. Whitfield's Guideline's Sentence range is as low as 27-33 months (for level 18) and as high as 41-51 months (for level 22).[5]  *See* USSG § 5a (Sentencing Table).  Since he has already served 38 months, The Court should sentence Mr. Whitfield to time served.

<u>**CONCLUSION**</u>

For the foregoing reasons, John Whitfield respectfully submits that a sentence of not greater than 38 months is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).  To the extent that this Court believes any remaining sentencing objectives need be met, they can be met by some combination of probation, home confinement, community service, and supervised release.  Because further imprisonment does not further any sentencing objective, Mr. Whitfield respectfully requests that he be released from federal prison immediately.

WHEREFORE, Mr. Whitfield respectfully requests that this Honorable Court impose a sentence of incarceration not to exceed the time he has served thus far; impose a fine of $75,000.00; and with a term of supervised release not to exceed twelve months.  Mr. Whitfield also requests that the Court grant him permission to seek employment opportunities outside of the State of Mississippi, and to authorize the transfer of his post release supervision should he secure employment outside of the Southern District of Mississippi.

To the extent that Mr. Whitfield has requested insufficient or inappropriate relief, he further moves the Court to grant him that relief which is just, proper, and equitable under the totality of circumstances applicable herein.

---

[4] At the low end, 10 (Base Offense Level) + 10 (benefit) - 2 (Acceptance) = 18 (Total).
At the high end, 10 (Base Offense Level) + 14 (benefit) - 2 (Acceptance) = 22 (Total).

[5] Level 20 results in a range of 33-41 months.  *See* USSG § 5a.

Respectfully Submitted, this the 7th day of March, 2011.

                                    By:    /s/ Drew M. Martin
                                           Drew M. Martin, MSB No. 101045
                                           Melissa Selman Martin, MSB No. 100990

*Martin Law Firm, PLLC*
1635 Lelia Drive, Suite 102
Jackson, MS 39216
Telephone: 601/366-8410
Facsimile: 866/945-9168
dmartin@martinlawfirmpllc.com


## **CERTIFICATE OF SERVICE**

I hereby certify that on the date indicated with my signature below, I electronically filed the

foregoing document with the Clerk of the Court using the ECF system, which sent notification of

such filing to all attorneys and parties registered to receive such notification.


3/7/11                          By:    /s/ Drew M. Martin
Date                                   Drew M. Martin, MSB #101045


27